UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

THOMAS McKINNEY,

Defendant

Case:2:09-cr-20041
Judge: Tarnow, Arthur J
MJ: Majzoub, Mona K
Filed: 01-29-2009 At 4:13 PM
INDI USA V. SEALED MATTER (1 DFT) T
AM

HONORABLE:

**VIOLATIONS**:

WIRE FRAUD
(18 U.S.C. 1343, 1346, 2)

THEFT OF TRADE SECRETS
(18 U.S.C. 1832, 2)

FALSE STATEMENTS
(18 U.S.C. 1001)

_____/

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1
### (Wire Fraud, 18 U.S.C, 1343, 1346, 2)

At times pertinent to this Indictment:

**General Allegations**

1. Harland Robertson Company ("HR") had an office in Livonia, Michigan, and operated a manufacturing facility in Harrison Township, Michigan. HR had been in business for more than 100 years, and it designed,

manufactured, and sold industrial chucks and chuck assemblies to the assembly and production industry, including but not limited to, the automotive industry. HR sold its chucks and chuck assemblies in interstate and foreign commerce.

2. As used herein, a chuck or a chuck assembly was a mechanism that held a moving part for the purpose of performing a machining or manipulation operation against a stationary tool. The HR chucks were heavy duty, high precision machines, which were used for accurate and high quality work.

3. HR also manufactured and marketed chucks under agreements with Cushman Industries and its successors in interest.

**HR's Draw-Down Chuck**

4. HR designed, manufactured, and sold its own brand Draw-Down Chuck with a unique seal mechanism to extend its life and allow for higher precision operation. HR's Draw-Down Chuck had a clamping mechanism which could effectively grip (hold) the item to be machined or manipulated.

5. HR invested in research and development to create its Draw-Down Chuck. HR, operating via its paid engineering consultant, developed a new proprietary design for a Draw-Down Chuck which offered customers improved quality, reduced scrap (waste), increased tool life, and reduced

wear on machines where the Draw-Down Chuck would be installed.

6. The HR Draw-Down Chuck incorporated trade secrets under state and Federal law, and it was HR's intellectual property. HR undertook reasonable steps to protect its trade secrets and intellectual property in the Draw-Down Chuck. Some of HR's protective measures included, among others, physical security of its premises, limiting access to the trade secrets only to those who needed access to perform their job duties, and computer security policies.

7. Because of its superior design and innovations, HR's Draw-Down Chuck had independent economic value, separate and apart from its development costs, and it was to be used in products to be sold in interstate and foreign commerce. The confidential trade secret information and intellectual property derived its independent economic value, both actual and potential, from not being generally known to the public.

**HR's Index Chuck**

8. HR designed, manufactured, and marketed its own brand Index Chuck. HR's Index Chuck had a clamping mechanism which could effectively grip (hold) the item to be machined or manipulated, and it could also rotate the item so that it could be machined or manipulated on more than one side or

angle.

9. HR invested in research and development to create its Index Chuck. HR, operating via its paid engineering consultant, developed a new proprietary design for an Index Chuck which offered customers improved quality.

10. The HR Index Chuck incorporated trade secrets under state and Federal law, and it was HR's intellectual property. HR undertook reasonable steps to protect its trade secrets and intellectual property in the Index Chuck. Some of HR's protective measures included, among others, physical security of its premises, limiting access to the trade secrets only to those who needed access to perform their job duties, and computer security policies.

11. Because of its superior design and innovations, HR's Index Chuck had independent economic value, separate and apart from its development costs, and it was to be used in products to be sold in interstate and foreign commerce. The confidential trade secret information and intellectual property derived its independent economic value, both actual and potential, from not being generally known to the public.

**The Cushman Industries Chucks**

12. The Cushman Industries chucks which HR manufactured and sold incorporated trade secrets under state and Federal law, and involved

intellectual property. HR undertook reasonable steps to protect the trade secrets and intellectual property regarding the Cushman Industries chucks which it manufactured and sold. Some of HR's protective measures included, among others, physical security of its premises, limiting access to the trade secrets only to those who needed access to perform their job duties, and computer security policies.

13. The Cushman Industries chucks which HR manufactured and sold had independent economic value, separate and apart from the development costs, and they were to be used in products to be sold in interstate and foreign commerce. The confidential trade secret information and intellectual property derived its independent economic value, both actual and potential, from not being generally known to the public.

### McKinney's Employment at HR

14. In or about October 2001, defendant Thomas McKinney began employment with HR as a sales engineer, working at HR's offices in Livonia. Upon joining HR, McKinney agreed to be bound by a HR's "Confidentiality and Intellectual Property Policy and Agreement."

15. At HR, McKinney was provided with a desktop computer, an e-mail account, and internet access

16. At HR, McKinney initially made telephone calls to existing customers (and potential new customers) and scheduled sales appointments for HR's owner/operator (HR's previous main salesman) and himself.

17. At HR, McKinney was also assigned to update HR's Customer Contact List and generate a new Customer Contact List including names of the purchasing officers at various companies, their addresses, telephone numbers and other confidential information about the customer (i.e., HR's previous sales to the company, its bid prices, orders, marketing strategy, etc.). After its creation, McKinney and HR's owner/operator frequently used the updated Customer Contact List in their sales efforts.

18. The HR Customer Contact List was a trade secret under state and Federal law, and involved intellectual property. HR undertook reasonable steps to protect the trade secrets and intellectual property regarding the Customer Contact List. Some of HR's protective measures included, among others, physical security of its premises, limiting access to the trade secrets only to those who needed access to perform their job duties, and computer security policies.

19. HR's Customer Contact List had independent economic value, separate and apart from its development costs. The confidential trade secret information

and intellectual property derived its independent economic value, both actual and potential, from not being generally known to the public.

20. In making sales presentations, to protect its trade secrets and intellectual property, HR used so-called assembly drawings or product brochures – which used general drawings (i.e., not trade secrets or intellectual property). These materials did not contain trade secrets, intellectual property, proprietary designs or so-called design level information.

21. It was also one of McKinney's duties at HR to convert paper, hard copy drawings into an electronic format files using CAD or AUTOCAD software. McKinney scanned paper drawings into digital format so they could be edited or printed on a computer equipped with AUTOCAD software. In performing this job, McKinney had access to HR's trade secrets and intellectual property, including but not limited to, HR's proprietary drawings for its Draw-Down Chuck and its Index Chuck.

22. In performing this job, McKinney also had access to HR's trade secret and intellectual property drawings regarding the Cushman Industries chucks which HR manufactured and sold.

23. While McKinney worked at HR, it attempted to sell its newly-designed Draw-Down Chuck to numerous automotive Original Equipment

Manufacturers, including Ford, GM, and Daimler Chrysler, as well as to other companies, such as Caterpillar, Inc. and Dana Corporation.

24. HR successfully sold its Draw-Down Chucks to GM, which purchased several on a trial basis. The HR Draw-Down Chucks performed well, and HR hoped to sell more of the assemblies to GM.

25. While McKinney worked at HR, it attempted to sell its newly-designed Index Chuck to Vickers Engineering, Inc.

**McKinney's Fiduciary Duties to HR**

26. As an employee of HR, McKinney occupied a fiduciary position of trust, confidence and obligation. In performing his duties for HR, McKinney owed to HR the fiduciary duties of fidelity, honesty, candor, loyalty, and care. McKinney was obligated to provide HR with his undivided loyalty free of conflicts of interests or potential conflicts of interests. McKinney was also obligated to protect and preserve HR's property, including its physical property, such as [A] the design drawings for the Draw-Down Chuck, the Index Chuck or the Cushman Industries chucks, and [B] HR's Customer Contact List, as well as its intangible property, including its trade secrets and intellectual property. Specifically, McKinney was obligated not to steal or remove from HR's premises its tangible or intangible property.

27. McKinney was obligated: [A] not to transfer HR's tangible or intangible property to another company or an actual or potential competitor to HR, [B] not to transfer HR's trade secrets or intellectual property to any other company or actual or potential competitor of HR.

28. HR had an intangible right to McKinney's honest services in the operation of the company's business. As such, McKinney owed to HR under the law of Michigan and the common law, a duty to: [A] refrain from the use of his position for private financial gain; [B] disclose conflicts of interest and other material information that resulted in his direct or indirect personal financial gain in matters over which he had authority; [C] refrain from holding financial interests that conflicted with the conscientious performance of his duties; [D] refrain from stealing or alienating HR's tangible or intangible property, and [E] refrain from transferring HR's tangible or intangible property to any other company, whether it was an actual or potential competitor of HR's.

**McKinney's Theft of Trade Secrets and Intellectual Property**

29. In or about December 2004 or January 2005, the exact date being unknown to the Grand Jury, McKinney contacted a Detroit-area company ("Company X") which manufactured chucks, seeking a new sales and marketing job.

30. In or about January 2005, the exact date being unknown to the Grand Jury, Company X offered McKinney a new job, and McKinney accepted the offer.

31. McKinney did not notify HR of his job offer, or his plans to leave HR and start work with Company X. Instead, McKinney continued to hold himself out to HR as a faithful, conscientious employee who was working solely for it.

32. In or about January 2005, the exact date being unknown to the Grand Jury, McKinney, without authority, removed and stole physical (paper) design drawings from HR's office in Livonia, and transported them to his residence in Brighton, Michigan. The drawings which McKinney stole from HR, involved, among other items, the HR Draw-Down Chuck, the HR Index Chuck, and the Cushman Industries chucks, which were trade secrets and intellectual property. McKinney stole the HR Draw-Down Chuck, the HR Index Chuck, and the Cushman Industries chuck drawings with the intent to provide a benefit to Company X (and/or himself, as a salesman for Company X), because Company X might be able to manufacture and market the HR Draw-Down Chuck, the HR Index Chuck, and the Cushman Industries chucks. McKinney did not disclose this fact to HR.

33. In or about January 2005, the exact date being unknown to the Grand Jury, McKinney, without authority, removed and stole HR's Customer Contact List from HR's office in Livonia, and transported it to his residence in Brighton, Michigan. McKinney stole the HR Customer Contact List with the intent to provide a benefit to Company X (and/or himself, as a salesman for Company X), because, with HR's Customer Contact List, Company X would be able to contact potential customers. McKinney did not disclose this fact to HR.

34. In or about January 2005, the exact date being unknown to the Grand Jury, but while McKinney was still employed by HR, McKinney began to contact HR's customers (and potential customers), claiming to be a full time employee of Company X, and offered to sell chucks similar or identical to those which HR sold.

35. On or about January 11, 2005, McKinney submitted a business proposal to Caterpillar, Inc. acting on behalf of Company X, to sell it Cushman Industries chucks. McKinney did not disclose this fact to HR; and HR had made similar business proposals to the same company.

36. On or about January 16, 2005, McKinney sent an e-mail, along with the drawing of a HR Draw-Down Chuck, to an employee at Company X.

McKinney did not disclose this fact to HR.

37. On or about January 23, 2005, McKinney sent an e-mail, along with a business proposal for Caterpillar, Inc. to an employee at Company X. McKinney did not disclose this fact to HR.

38. On or about January 24, 2005, McKinney signed an "Inside Sales Contract" with Company X, establishing the terms of his compensation for his new job. McKinney did not disclose this fact to HR.

39. On or about January 24, 2005, from his desktop computer at HR, McKinney sent electronic files of HR chuck drawings to his personal account at Yahoo!, located in California (tpm48843@yahoo.com).

40. On or about January 24, 2005, McKinney submitted a business proposal to Caterpillar, Inc. (via BDI Industrial Supplies), on behalf of Company X. McKinney did not disclose this fact to HR; and HR had made similar business proposals to the same company.

41. On January 26, 2005, from his desktop computer at HR, McKinney forwarded five e-mails from his HR e-mail account to his account at Yahoo!

42. On or about January 26, 2005, from his desktop computer at HR, McKinney sent two electronic files of HR drawings to his personal account at Yahoo!, located in California. One electronic file contained 80 subfiles, and the

second file contained 19 subfiles, including HR's trade secret information and intellectual property: [A] for HR's Draw-Down Chucks, [B] for HR's Index Chucks, and [C] for the Cushman Industries chucks which HR manufactured and marketed.

43. McKinney did not report to HR his transfer of its corporate property to his Yahoo! account or his theft of the electronic files and drawings.

44. On or about Friday, January 28, 2005, McKinney provided his resignation of employment to HR's owner/operator, falsely claiming that he (McKinney) wished to quit selling chucks and go to work with his brother-in-law in the home construction business.

45. Later that same day (January 28, 2005), HR's owner/operator asked McKinney for an update on several pending proposals to sell HR's chucks to large manufacturing concerns; McKinney falsely replied that the leads were all cancelled or were otherwise closed.

46. After McKinney started work at Company X, and until an unknown date in late 2006, he continued to attempt solicit business from the same companies he had previously called upon while at HR, as well as contacting new leads for Company X, including: [A] for his new company, attempting to sell the HR Draw-Down Chuck, although under the brand name of Company X, [B]

for his new company, attempting to sell the HR Index Chuck, although under the brand name of Company X, and and [C] for his new company, attempting to sell the Cushman Industries chucks, although under the auspices of Company X.

47. In seeking business from companies which dealt with HR (or which HR might logically seek out as new customers), Company X and McKinney used advertising materials and brochures which were copies of HR's materials; and in some cases, Company X and McKinney submitted bids and proposals copying a similar HR proposal.

48. And after McKinney began work for Company X, at McKinney's recommendation, the company attempted to retain the engineering consultant who had worked for HR and invented the HR Draw-Down Chuck and the HR Index Chuck.

**The Scheme and Artifice to Defraud HR**

49. From in or about January 2005 through an unknown date, the exact dates being unknown to the Grand Jury, McKinney, aided and abetted by others known and unknown by the Grand Jury, devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations or promises (which were material to HR),

specifically to defraud HR of: [A] its property, that is, its trade secrets and intellectual property in the HR Draw-Down Chuck, the HR Index Chuck, the Cushman Industries chucks which HR manufactured and sold, and HR's Customer Contact List, and [B] HR's intangible right to McKinney's honest services in the execution of his duties as a faithful HR employee.

50. As more fully set forth below, on or about the date listed below, in the Eastern District of Michigan, Southern Division, and elsewhere, Defendant

**THOMAS McKINNEY**

having knowingly devised and intending to devise, a scheme and artifice to defraud (including a scheme and artifice to defraud HR of the intangible right to McKinney's honest services), and to obtain money and property by means of false and fraudulent pretenses, representations and promises, for the purposes of executing the scheme and artifice, and attempting to do so, knowingly transmitted and caused to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures and sounds, to wit:

| Count | Date and Item Sent by Interstate Wire Communication |
|---|---|
| 1 | On or about January 26, 2005, McKinney, from HR's office in Livonia, using an interstate wire communication facility, transmitted information in the form of 99 subfiles (including HR's trade secrets and intellectual property) to his personal account at Yahoo! in California |

**All in violation of Title 18, United States Code, Sections 1343, 1346, 2.**

## COUNT 2
## (18 U.S.C. 1832(a)(1), 2,
## Theft of Trade Secrets)

51.  The allegations contained in paragraphs 1 through 49 above are incorporated by reference as if set forth fully herein.

52.  On or about January 26, 2005, in the Eastern District of Michigan, Southern Division, and elsewhere, Defendant

**THOMAS McKINNEY,**

did knowingly and intentionally, with the intent to convert information that included trade secrets belonging to HR, that were related to and included in products produced for and placed in interstate and foreign commerce, to the economic benefit of a person other than the owner thereof, and intending and knowing that the offense would injure the owner of the trade secrets, did transmit, deliver, send, communicate and convey such information, and attempt to do so, to wit, by sending HR's Draw-Down Chuck, HR's Index

Chuck, and Cushman Industries chuck files to McKinney's personal Yahoo! e-mail account.

**All in violation of Title 18, United States Code, Sections 1832(a)(1), (a)(2) and (a)(3) and Section 2.**

## COUNT 3
### (False Statements: 18 U.S.C. 1001)

53. The allegations contained in paragraphs 1 through 49 above are incorporated by reference as if set forth fully herein.

54. On or about August 29, 2005, as specified below, in the Eastern District of Michigan, Southern Division, Defendant

**THOMAS McKINNEY**

in a matter within the jurisdiction of the Federal Bureau of Investigation ("FBI"), U.S. Department of Justice, part of the executive branch of the Government of the United States, did knowingly and willfully make material false, fictitious or fraudulent statements and representations, such statements and representations being material to the topics then under investigation by the FBI, as follows:

| Specification # | False Statements and Representations |
|---|---|
| #A | McKinney falsely stated that he left HR's employment because he did not feel safe and that an HR employee had threatened him, when in truth and in fact, as McKinney well knew, that was not the reason why he left HR's employment |
| #B | McKinney falsely stated that he did not sign an intellectual property rights agreement upon joining HR, when in truth and in fact, McKinney knew that he had signed HR's "Confidentiality and Intellectual Property Policy and Agreement" upon joining HR |
| #C | McKinney falsely stated that he never sent any HR drawings via his personal e-mail account at tpm48843@yahoo.com, when in truth and in fact, McKinney knew that he had sent HR drawings via that account |
| #D | McKinney falsely stated that he had sent a few assembly drawings via his personal (Yahoo!) e-mail account in approximately 2004 because HR's e-mail server was down at the time and he needed to work on the files at home, when in truth and in fact, McKinney knew that he had sent HR files to his Yahoo! e-mail account as recently as January 2005, and, at the time, the HR e-mail server had not been out of operation |
| #E | McKinney falsely stated that he did not transfer any HR files in electronic format to Company X, when in truth and in fact, McKinney knew that he had transferred HR files in electronic format to Company X |

**All in violation of Title 18, United States Code, Section 1001.**

THIS IS A TRUE BILL

s/ Foreperson Grand Jury
FOREPERSON
GRAND JURY


TERRENCE BERG
Acting United States Attorney

SHELDON N. LIGHT
Chief, Economic Crimes Unit

s/ CHRISTOPHER L. VARNER
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9684
Fax: (313) 226-2873
E-Mail: Christopher.Varner@usdoj.gov
Bar Id: 413642

Dated: January 29, 2009

| United States District Court<br>Eastern District of Michigan | Criminal Case Cov | Case: 2:09-cr-20041<br>Judge: Tarnow, Arthur J<br>MJ: Majzoub, Mona K<br>Filed: 01-29-2009 At 04:13 PM<br>INDI USA V. SEALED MATTER (1 DFT) T<br>AM |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to co

| Companion Case Information | Companion Case Number: |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | Judge Assigned: |
| Yes    X    No | AUSA's Initials: CLV |

**Case Title:** <u>U.S. v. THOMAS McKINNEY</u>

**County where offense occurred:** WAYNE

**Check One:**    X Felony    ☐ Misdemeanor    ☐ Petty

_X_ Indictment/___Information --- no prior complaint.
___Indictment/___Information -- based upon prior complaints [          ]
___Indictment/___Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below].*

**Superseding Case Information:**

**Superseding to Case No: Judge:** _____

☐ Original case was terminated; no additional charges or defendants.
☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

**Defendant name**    **Charges**

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

January 29, 2009
Date

*[signature]*

CHRISTOPHER L. VARNER
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone: (313) 226-9684
Fax: (313) 226-2873
Email: Christopher.Varner@usdoj.gov
Bar ID: 413642 (D.C.)

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

5/20/04